***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before the Deputy Commissioner and the briefs and argument of the parties. The appealing party has not shown good ground to receive further evidence or rehear the parties or their representatives. Following its review, the Full Commission affirms the Opinion and Award of the Deputy Commissioner, with certain modifications.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. That all parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over this matter.
2. That all parties were subject to and bound by the North Carolina Workers' *Page 2 
Compensation Act on the dates of the alleged injury.
3. That all parties have been properly designated, and there is no question as to joinder or non-joinder of parties.
4. That insurance coverage existed on the date of injury.
5. That Plaintiff alleges to have sustained a compensable injury on 9/19/05.
6. That an employment relationship existed between Plaintiff and Defendant-Employer during some or all of the time period of the previous paragraph.
7. Plaintiff's average weekly wage is $977.83 and his compensation rate is $651.92.
8. It is stipulated and agreed that the medical records and bills are genuine and authentic; and, if relevant and material, may be received in evidence without further identification or proof.
 ***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is 60 years old and a resident of Catawba County, where he has lived for most of his life. He completed the 11th grade, then obtained a GED and a degree in Business Administration from CVCC. He was also honorably discharged from the Army.
2. Plaintiff began working with Defendant-Employer in 1982 as a groundskeeper performing outdoor maintenance of the grounds. From that point forward, he worked his way up through the company to quality control and into the position of Primary Operator, which he held at the time of injury.
3. On September 19, 2005, Plaintiff suffered a fall at work. Specifically, Plaintiff was dismounting a forklift when his boot lace was caught in the emergency brake pedal. He fell *Page 3 
to the concrete floor below where he describes feeling an immediate onset of shoulder, low back, neck, and buttock pain. Defendants admitted liability for the lower back and right shoulder injuries on a Form 60.
4. Plaintiff received treatment for his neck and shoulder from Dr. Peter Hurley of Hickory Orthopaedics, who recommended an MRI. The MRI revealed a rotator cuff tear. Plaintiff was prescribed a steroid Dose Pak. Dr. Hurley repaired the tear through arthroscopic surgery on January 17, 2006.
5. When Dr. Hurley treated Plaintiff in February of 2006 following the surgery, he noted that the shoulder was progressing well. Dr. Hurley restricted Plaintiff to "no use of his right upper extremity," but did not take Plaintiff out of work completely. Because of his limitations, he was placed in a position in the guard shack rather than in his regular job.
6. Following his return to work, Plaintiff continued to experience pain from the fall and was given another steroid Dose Pak. Initially, Plaintiff believed that the pain originated from his low back and buttocks. He began treatment for his low back. As time passed, however, it became evident that his hips were contributing to a large degree to his perceived low back pain.
7. In March 2006, Dr. Hurley noted that Plaintiff's shoulder was improving, but that he was having pain in his neck. Dr. Hurley referred Plaintiff to Dr. Jeffrey Knapp for his neck pain. On October 10, 2006, Dr. Hurley opined that Plaintiff had reached maximum medical improvement with regard to his right shoulder, assigned an 8% impairment rating to his right arm, and released Plaintiff to return to work without restrictions as to his right shoulder. Plaintiff continued to work for Defendant-Employer.
8. Dr. Knapp, an orthopedic surgeon, examined Plaintiff on June 7, 2006, for neck *Page 4 
pain persisting after his shoulder surgery, and back pain. In August 2006, Dr. Knapp stated that Plaintiff's neck had markedly improved. By October 2006, however, Dr. Knapp indicated that Plaintiff was having back and leg pain greater than his neck or shoulder pain. Dr. Knapp attributed the back and leg pain to spinal stenosis.
9. Dr. Deloy C. Oberlin, an anesthesiologist, first treated Plaintiff in May 2006 for pain management. Because Plaintiff's predominant pain was in his neck, Dr. Oberlin performed a cervical epidural steroid injection. When Plaintiff returned on August 3, 2006, his primary complaint was of left hip and thigh pain. Therefore, Dr. Oberlin performed a caudal epidural steroid injection. Plaintiff received a total of four such injections.
10. By February 16, 2007, Dr. Knapp felt Plaintiff "had recovered sufficiently from his neck problem" and he assigned Plaintiff a 5% impairment rating for his neck injury. No surgery was performed on Plaintiff's back.
11. Dr. Alfred Geissele, an orthopedist, examined Plaintiff for left hip pain on April 13, 2007. Based on Plaintiff's description of the injury, Dr. Geissele opined that Plaintiff hyperextended his hip when he fell off of the forklift. Dr. Geissele diagnosed Plaintiff as having avascular necrosis caused by trauma.
12. Since Plaintiff's pain was originating in his hips, Dr. Geissele referred Plaintiff to Dr. Donald A. Campbell because Dr. Campbell specializes in hips. Dr. Campbell, an orthopaedic surgeon, examined Plaintiff on April 18, 2007. After examining Plaintiff and reviewing his x-rays, he diagnosed Plaintiff with avascular necrosis which required hip replacement.
13. Dr. Lowell H. Gill, an orthopedic surgeon, treated Plaintiff for left hip pain beginning on May 15, 2007. Dr. Gill diagnosed Plaintiff with avascular necrosis and *Page 5 
recommended hip replacement.
14. Plaintiff went out of work to have a total left hip arthroplasty performed by Dr. Gill on May 21, 2007. On November 15, 2007, he underwent the same procedure for his right hip, remaining out of work between the two surgeries. Following the hip replacements, Plaintiff still experienced some low back pain, but his hips were markedly better.
15. In addition to his hip problems, Plaintiff developed bilateral knee problems for which he had arthroscopic surgery on both knees.
16. As Plaintiff recovered from the bilateral hip and knee surgeries, twelve months passed from his last day at work in May 2007. As a result, Plaintiff was terminated from his employment due to Defendant-Employer's medical absence policy.
17. Plaintiff testified that at the time of the hearing his hips were healed and he felt as though they were essentially pain-free, but that he still experiences some pain in his shoulder and pain in his lower back and neck. He reported some continued pain in his knees, for which he had been told that he would likely need bilateral knee replacements at some point in the future. Dr. Gill indicated in his deposition that he felt that Plaintiff's ability to work has been impaired, but that he could perform some work.
18. Plaintiff contends that his hip condition was caused by the steroid Dose Paks he was prescribed for his injury by accident. Several of his treating physicians were questioned regarding this issue during their depositions.
19. Dr. Oberlin testified that the dosage of steroids injected into Plaintiff was less than he would receive if he were being treated for poison ivy. Dr. Oberlin further testified that he has never seen the steroid injections such as those he administered to Plaintiff cause avascular necrosis. Dr. Oberlin testified "we know that much of the time that [avascular necrosis] can be *Page 6 
idiopathic, which is to say there's no necessarily known causative agent. It can be as a result of trauma. It can be as a result of alcohol. . . . It can be associated with steroid use, usually chronic long-term steroids."
20. Dr. Geissele testified in his deposition that Plaintiff developed his left hip avascular necrosis due to trauma from his fall. However, he further testified that he would not attribute the development of avascular necrosis in the right hip to the injury.
21. At deposition, Dr. Campbell disagreed with Dr. Geissele's opinion. Dr. Campbell testified that "even in cases of complete dislocation of the hip, there is only about a ten percent rate of avascular necrosis, and [Plaintiff] clearly didn't have a complete dislocation of the hip. So I would think it would be less likely than 10 percent." Dr. Campbell indicated that the fact that Plaintiff developed avascular necrosis in his other hip confirmed his opinion, stating that Plaintiff's avascular necrosis was either idiopathic or caused by other factors like smoking or drinking and was "not related to the job at all."
22. Dr. Campbell testified that there are no objective findings that steroid use or trauma caused Plaintiff's avascular necrosis. Dr. Campbell testified that it would be speculation by anyone to diagnose avascular necrosis in this case and narrow it down to the particular cause.
23. Early in his deposition, Dr. Gill opined to a reasonable degree of medical certainty that Plaintiff's avascular necrosis, in both hips, was caused by the courses of oral steroids for his shoulder injury and other steroids he received. During his deposition, Dr. Gill read his February 2008 medical note, which stated that he advised Plaintiff that he could not be certain of the cause of the avascular necrosis, but that steroid use can lead to this as well as other causes. Dr. Gill confirmed in his deposition that the use of steroids may result in an increased risk, but that there is no definitive conclusive correlation between the use of steroids and the *Page 7 
onset of avascular necrosis. Dr. Gill testified that avascular necrosis "can be idiopathic. But it is also correct that if steroids have been used in the past, that is the presumed cause in most people's minds. But I cannot prove that."
24. Dr. Gill also performed the arthroscopies of Plaintiff's knees. With regard to Plaintiff's left knee torn meniscus, Dr. Gill states ". . . that can come from a fall quite often, but it also can come from just wearing out. And there is no real way to know whether that tear in the shock absorber came from an injury or from just wearing out, because it happens both ways very frequently." Dr. Gill further testified, with regard to the lack of causal connection between the injury and Plaintiff's bilateral knee conditions, that "the only relationship I could give is if the patient said that his pain was only after the fall, then I have — then, if he's telling me the truth, then there is a possible relationship there. But there is no way I can say for certain what the cause of either of those was."
25. The Full Commission gives greater weight to the testimony of Dr. Campbell and Dr. Oberlin than to the testimony of Dr. Geissele and Dr. Gill. Dr. Gill's opinion was too speculative to be persuasive. Dr. Geissele's opinion regarding the left hip is less persuasive in light of the fact that Plaintiff developed avascular necrosis in both hips and the opinion of Dr. Campbell that avascular necrosis would not be likely to occur in each hip for a separate reason. Plaintiff asserts that Dr. Oberlin's opinion should not be accorded weight because he was only considering the steroid injections he administered to Plaintiff. However, Dr. Oberlin's testimony does have value with respect to the potential causes of avascular necrosis and the fact that it is most often idiopathic.
26. The greater weight of the evidence establishes that Plaintiff's bilateral hip condition is not causally related to the injury by accident on September 19, 2005. *Page 8 
27. The greater weight of the evidence establishes that Plaintiff's knee conditions are not causally related to the injury by accident on September 19, 2005.
28. Although Plaintiff testified regarding continued shoulder and back pain, he did not offer any evidence that he has been taken out of work or restricted from work for those conditions. The evidence is insufficient to establish that Plaintiff is incapable due to his compensable shoulder, neck, and back injuries of earning the same wages he had earned before these injuries in the same or any other employment.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On September 19, 2005, Plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with Defendant-Employer. N.C. Gen. Stat. § 97-2(6). This accident resulted in injuries to Plaintiff's right shoulder, neck, and back.
2. The evidence was insufficient to establish that Plaintiff's compensable injury by accident caused his problems with his hips or his knees. N.C. Gen. Stat. § 97-2(6).
3. The evidence was insufficient to show that Plaintiff remains temporarily totally disabled by his compensable injuries. As a result of Plaintiff's compensable accident of September 19, 2005, he is entitled to payment from Defendants for an 8% permanent partial disability to his right arm and a 5% permanent partial disability to his back. N.C. Gen. Stat. § 97-31.
4. Plaintiff is entitled to all medical expenses incurred or to be incurred as a result of Plaintiff's compensable accident of September 19, 2005, for so long as such examinations, *Page 9 
evaluations and treatments may reasonably be required to effect a cure, give relief or tend to lessen Plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing Stipulations, Findings of Fact, and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Using the stipulated compensation rate of $651.92, Defendants shall pay to Plaintiff permanent partial disability benefits for 19.2 weeks for the 8% rating to his right arm and for 15 weeks for the a 5% rating for his back. Said amount shall be paid to Plaintiff in a lump sum, less 25% which shall be deducted as an approved attorney fee and sent directly to Plaintiff's counsel.
2. Defendants shall continue to pay for all medical treatment as a result of Plaintiff's compensable injury by accident of September 19, 2005, for so long as said treatment effects a cure, gives relief, or tends to lessen the period of Plaintiff's disability. Said treatment shall be for Plaintiff's neck, right shoulder, and his back. Said treatment does not include treatment for Plaintiff's knees or hips.
3. Each side shall bear its own costs.
This the ___ day of February, 2010.
 S/___________________ PAMELA T. YOUNG CHAIR
CONCURRING: *Page 10 
 S/___________________ DIANNE C. SELLERS COMMISSIONER
 S/___________________ STACI T. MEYER COMMISSIONER *Page 1